LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel:   (818) 347-3333
Fax:   (818) 347-4118

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLE WILKINS AND WILLOW JONES,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>STATE OF CALIFORNIA; COUNTY OF ORANGE; MICHAEL MURRAY; LARRY YELLIN; WESLEY VANDIVER; JOSEPH MORRISON, AND DOES 1-10, inclusive,<br><br>　　　　Defendants. | Case No. 8:20-cv-02417-JLS-DFM<br><br>[*Hon. Josephine L. Staton*]<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS COUNTY OF ORANGE AND LARRY YELLIN'S MOTION TO DISMISS (DKT. NO. 22); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: September 17, 2021<br>Time: 10:30 a.m.<br>Courtroom: 10A |

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES............................................1

I. INTRODUCTION ...........................................................................1

II. STATEMENT OF FACTS ...............................................................2

III. LEGAL STANDARD.......................................................................7

IV. PLAINTIFFS' CLAIMS AGAINST YELLIN SURVIVE ...................8

    A. Plaintiffs Sufficiently Allege that OCDA Prosecutor Yellin was Deeply Involved in Wilkins' Case When the Misconduct Occurred...........................................................8

    B. Yellin is Not Entitled to Absolute Immunity ............................10

    C. Yellin is Not Immune Under Cal Gov't Code 821.6.................14

V. PLAINTIFFS' CLAIMS AGAINST THE COUNTY SURVIVE .......16

    A. Wilkins' Municipal Liability Claims Under 42 U.S.C. 1983 ....................................................................................16

        1. Ratification .........................................................17

        2. Failure to Train ..................................................18

        3. Unconstitutional Custom, Practice, and Policy...............18

    B. Plaintiffs' State Law Claims for Vicarious Liability Against the County Survive.........................................................20

VI. WILKINS ADEQUATELY PLED HIS BANE ACT CLAIM ...........20

VII. WILKINS ADEQUATELY PLED HIS BRADY CLAIMS................20

VIII. PLAINTIFFS ADEQUTELY PLED THEIR CLAIMS FOR PUNITIVE DAMAGES ........................................................21

IX. REQUEST TO AMEND.................................................................22

X. CONCLUSION ...........................................................................23

# TABLE OF AUTHORITIES

## Cases

*Allen v. Lowder*, 875 F.2d 82, 86 (4th Cir.1989)....................................................13

*Asgari v. City of Los Angeles*, 15 Cal.4th 744 (1997) ...........................................16

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)............................................................7

*Bagley*, 473 U.S. at 682 ..........................................................................................21

*Berry v. Fletcher*, 3 F.Cas. 286, 288 (C.C. Mo. 1870)..........................................22

*Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) .......................18

*Broam v. Bogan*, 320 F.3d 1023, 1031 (9th Cir. 2003)..........................................11

*Buckley v. Fitzsimmons*, 509 U.S. 259, 274 n. 5 (1993)..........................................11

*Burns v. Reed*, 500 U.S. 478 (1978) .......................................................................10

*Burns v. Reed*, 500 U.S. 478, 495 (1991) ..........................................................12, 13

*Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)...........................................17

*City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ..............................................18

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) .....................................17

*Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. (Cal.) 2009) ............................16

*Cowen v. Winters*, 96 F. 929, 935 (6th Cir. 1899)..................................................22

*Dang v. Cross*, 422 F.3d 800, 806–07 (9th Cir. 2005)...........................................22

*Doe v. United States*, 419 F.3d 1058 .................................................................8, 22

*Florida Ry. & Nav. Co. v. Webster*, 25 Fla. 394, 5 So. 714, 719 (1889) .................22

*Fotheringham v. Adams Exp. Co.*, 36 F. 252, 253 (E.D. Mo. 1888).......................22

*Frink & Co. v. Coe*, 4 Greene 555, 1854 WL 228, at *4 (Iowa 1854).....................22

*Garmon v. County of Los Angeles*, 828 F.3d 837 (9th Cir. 2016).............................11

*Gillan v. City of San Marino*, 55 Cal.Rptr.3d 158, 171 (Cal.App. 2 Dist. 2007)......15

*Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26, 28 (1st Cir.1995) ..............................11

*Herrera v. Las Vegas Metropolitan Police Dept.*, 298 F. Supp. 2d 1043, 1055-56 (D. Nev. 2004) ............................................................................................................22

*Houston v. Partee*, 978 F.2d 362, 367 (7th Cir. 1992) .......................................12, 13

*Hovey v. Ayers*, 458 F.3d 892, 916-17 (9th Cir. 2006)..............................................20

*Jacobus v. Congregation of Children of Israel*, 107 Ga. 518, 33 S.E. 853, 855 (1899) ...............................................................................................................22

*Kalina v. Fletcher*, 522 U.S. 118 (1997) ....................................................................11

*Kyles v. Whitley,* 514 U.S. 419 (1995)........................................................................21

*Lytle v. Carl*, 382 F.3d 978, 987–88 (9th Cir. 2004) ..................................................17

*Malley v. Briggs*, 475 U.S. 335, 342 (1986) ..............................................................12

*Martinez v. City of Los Angeles*, 141 F.3d 1373, 1380 (9th Cir. 1998) .............15, 16

*Maysville & L.R. Co. v. Herrick*, 76 Ky. 122, 127 (1877) ........................................22

*Mitchell v. Forsyth*, 472 U.S. 511, 521 (1985) ..........................................................13

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)...........................................17, 18

*Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)..............................................18

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ........................................18

*People v. Boss*, 210 Cal. 245, 290 (1930)....................................................................4

*People v. Pulido*, 15 Cal. 4th 713, 723, fn. 3 (1997) ...................................................4

*People v. Salas*, 7 Cal. 3d 812, 820-24 (1972) ............................................................4

*People v. Wilkins*, 191 Cal. App. 4th 780 (2011) ........................................................5

*People v. Wilkins*, 2020 WL 64715 (Jan. 7, 2020) ......................................................6

*People v. Wilkins*, 251 P.3d 940 (2011) ......................................................................5

*People v. Wilkins*, 56 Cal. 4th 333 (2013) ..................................................................5

*People v. Young*, 34 Cal. 4th 1149, 1175 (2005)..........................................................4

*Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) ...............................20

*Shaw v. California Dept. of Alcoholic Beverage Control*, 788 F.2d 600 (9th Cir. 1986).................................................................................................................18

*Smith v. Wade*, 461 U.S. 30 (1983) .....................................................................21, 22

*Strickler v. Greene*, 527 U.S. 263, 263 (1999) ....................................................20, 21

*Sullivan v. County of Los Angeles,* 12 Cal.3d 710, 719–722 (1974)........................15

*Tennison v. City and County of San Francisco*, 2006 WL 733470 (C 04-0574 CW, C 04-1643 CW) (March 22, 2006)..................................................................13

*Ulrich v. City and County of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002).....17

*United States v. Bagley,* 473 U.S. 667, 676 (1985) ....................................................20

*United States v. Reese*,
    2 F. 3d 870 (9th Cir. 1993) ...................................................................................20

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) ......................................................10

*Wallace v. City of Los Angeles*, 12 Cal.App.4th 1385, 1403–04 (1993)..................16

*Welch v. Durand*, 36 Conn. 182, 185 (1869)..............................................................22

*Wright v. Jones*, 907 F.2d 848, 852 (8th Cir. 1990) ...................................................21

## Rules

Federal Rule of Civil Procedure 15(a)(2) ...............................................................2, 23

Rule 12(b)(6)...........................................................................................................7, 19

## Codes

Cal. Govt. Code §815.2(b)......................................................................................15, 20

California Civil Code ¶ 52.1 ........................................................................................20

California Government Code section 821.6 .....................................................14, 15, 16

California Penal Code §189...........................................................................................4

Government Code section 820.4 ..................................................................................15

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.   <u>INTRODUCTION</u>

This civil rights and state tort case arises from the wrongful conviction of Plaintiff Cole Wilkins ("Wilkins") and the related fabrication of false evidence and *Brady* violations committed by the Defendants.  As a result of the Defendants' destruction of initial California Highway Patrol ("CHP") traffic reports containing exculpatory evidence and the Defendants fabrication of false CHP traffic reports, Wilkins was wrongfully convicted of first-degree murder and incarcerated for approximately thirteen years for what ultimately became an involuntary manslaughter conviction carrying a maximum sentence of four years.  Defendants County of Orange ("County") and Larry Yellin ("Yellin") have filed a motion to dismiss ("Motion") Plaintiffs' Complaint.  Plaintiffs oppose the Motion and address each of Defendants' arguments in turn below.

Yellin is the Orange County District Attorney's Office ("OCDA") prosecutor who filed the charges against Wilkins in 2006 and presented the case on behalf of the People at the preliminary hearing. After learning about the altered and destroyed CHP traffic reports, Wilkins filed a motion to recuse the OCDA, alleging outrageous government conduct.  The presiding judge recused Yellin from the case, finding that Yellin was deeply involved in Wilkins' case at the time that the misconduct occurred, with Yellin being the case filer and the prosecutor who presented the matter on behalf of the People at the preliminary hearing.  Plaintiffs allege that the OCDA/prosecution, including Yellin, failed to disclose exculpatory evidence and committed other violations of Wilkins' rights.  Implicit throughout Plaintiffs' allegations that Yellin was recused from the retrial because he was deeply involved in the case when the misconduct occurred is an allegation that Yellin knew or should have known that the initial CHP reports were destroyed and/or altered.  If this Court is inclined to grant Defendants' Motion, then Plaintiffs respectfully request leave to

amend their Complaint to correct any deficiencies identified by this Court pursuant to Federal Rule of Civil Procedure 15(a)(2), which states that leave to amend should be freely given.

## II. __STATEMENT OF FACTS__[1]

On July 7, 2006, Cole Wilkins was driving westbound on the 91 Freeway in Anaheim with stolen kitchen appliances in the back of his truck.  Mr. Wilkins had driven approximately 60 miles from a location in Riverside County when a boxed stove fell from the back of his truck onto the freeway at approximately 5:00 a.m. on that date.  When the stove fell off the truck, Mr. Wilkins was travelling in the number two lane at approximately 55 to 60 miles per hour.  Mr. Wilkins was unaware that the stove had fallen off the back of his truck until he stopped in a parking lot after a motorist on the freeway, D. Lay, directed him to pull over.  Unbeknownst to Mr. Wilkins, D. Lay's vehicle had briefly collied with the stove.  When D. Lay informed Mr. Wilkins that the stove had fallen from his truck, Mr. Wilkins was surprised.

D. Piquette ("Piquette"), a former Riverside County sheriff's deputy, swerved sharply to the right to avoid the stove, veered across the freeway, and collided with a cement truck.  The cement truck flipped over and landed on Piquette's car, crushing him to death ("the fatal collision").  Motorists C. Thomas and R. Howard also briefly collied with the stove on the freeway in their separate vehicles.  Several other drivers swerved to avoid the stove on the freeway without incident, and only the four aforementioned collisions (D. Lay, C. Thomas, R. Howard, and D. Piquette) were reported.  Shortly after the collisions occurred, CHP officers prepared traffic reports relating to each of the four collisions.  Each traffic report identified the primary collision factor ("PCF") of each collision.  At least two investigating CHP

---

[1] Citation: Plaintiffs' Complaint ("Cmpl.") at Dkt. No. 1 at  ¶¶ 24-46.

1 officers, including CHP Officer John Heckenkemper ("Heckenkemper"), opined that

2 the four collisions related to the stove, including the fatal collision, were not caused

3 by Mr. Wilkins; rather, they were caused by the errant driving of other motorists

4 who either struck or took evasive action to avoid the stove.  Importantly, the original

5 CHP traffic report pertaining to the fatal collision indicated that Piquette's driving

6 was the primary cause of the fatal collision.  In other words, the CHP initially

7 concluded and documented that Mr. Wilkins was not the PCF of the fatal collision.

8       Shortly after the collisions, Heckenkemper wrote a report that identified the

9 PCF of the second collision relating to the stove.  Heckenkemper opined that the

10 driver involved in the second collision, R. Howard, was at fault, concluding that R.

11 Howard was driving too fast for the conditions.  Heckenkemper submitted his

12 report, and a reviewing officer in the CHP Accident Investigation Unit ("AIU")

13 signed off on the report.  After Heckenkemper's report was finalized and approved

14 by the AIU, CHP Sgt. Joseph Morrison changed Heckenkemper's report.  Morrison

15 told Heckenkemper that he had destroyed his report and changed the PCF to "other

16 than driver" because Mr. Wilkins was being charged with felony murder, and law

17 enforcement wanted the PCFs in the three collisions to be consistent.

18 Heckenkemper did not approve or agree with the changes made to his report.

19 Heckenkemper told Wesley Vandiver, an investigator for the OCDA that his report

20 had been changed and that he did not agree with Sgt. Morrison's PCF.  Vandiver

21 responded, "I don't want to hear about it," or words to that effect. Sgt. Morrison also

22 altered the traffic report regarding the fatal collision to reverse the conclusion that

23 Piquette's driving was the PCF.  Sgt. Morrison shredded the initial CHP traffic

24 reports.  Mr. Wilkins was unaware of the initial CHP traffic reports and their

25 exculpatory opinions until long after his first trial conviction.

26       It is against CHP policy to change a PCF without consulting with the officer

27 who wrote the report, and it is against CHP policy to change a report after an officer

28 from the AIU has signed off on the report.  On July 13, 2006, the prosecution

PLAINTIFFS' OPPOSITION TO DEFENDANTS COUNTY'S AND YELLIN'S MOTION TO DISMISS

1   (including Yellin) filed a complaint against Mr. Wilkins, alleging a violation of

2   California Penal Code §187 (murder).  On October 30, 2006, the prosecution

3   (including Yellin) filed the Information, alleging the same charge.  A jury trial

4   commenced on April 17, 2008 ("the first trial").  At the first trial, the prosecution

5   (including Yellin) charged Mr. Wilkins with first degree murder under the felony-

6   murder rule.  On information and belief, the prosecution, including the OCDA

7   defendants (i.e., Yellin), would not have pursued a first-degree murder charge

8   against Mr. Wilkins had Piquette not been a member of law enforcement.

9       The felony-murder rule provides that "[a]ll murder . . . which is committed in

10   the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery,

11   burglary, mayhem, [or] train wrecking . . . is murder of the first degree." California

12   Penal Code §189.  "Under the felony-murder rule, a strict causal or temporal

13   relationship between the felony and the murder is not required; what is required is

14   proof beyond a reasonable doubt that the felony and murder were part of one

15   continuous transaction.  [Citation.]  This transaction may include a defendant's

16   flight after the felony to a place of temporary safety."  *People v. Young*, 34 Cal. 4th

17   1149, 1175 (2005).  "A killing committed by a robber during his or her flight from

18   the scene of the crime, and before reaching a place of temporary safety, comes

19   within section 189."  *People v. Pulido*, 15 Cal. 4th 713, 723, fn. 3 (1997) (citing

20   *People v. Salas*, 7 Cal. 3d 812, 820-24 (1972)); *see also People v. Boss*, 210 Cal.

21   245, 290 (1930).

22       While the first trial was in progress, former CHP Chief Steven Beeuwsaert

23   told OCDA prosecutor Michael Murray about the changed traffic reports.  Murray

24   told Chief Beeuwsaert that it did not matter because Mr. Wilkins was a fleeing

25   felon, and Murray intended to pursue a conviction against Mr. Wilkins under the

26   felony-murder rule.  On May 5, 2008, a jury convicted Mr. Wilkins of first-degree

27   murder under the felony-murder theory that the fatal collision involving Piquette

28   occurred in the commission of a burglary.  On July 11, 2008, Mr. Wilkins was

1  sentenced to 26 years to life in prison.  Mr. Wilkins appealed his conviction, arguing

2  that the trial court erred when it refused to instruct the jury pursuant to CALCRIM

3  No. 3261 as discussed above.  On January 7, 2011, the California Court of Appeal in

4  *People v. Wilkins*, 191 Cal. App. 4th 780 (2011) affirmed the trial court's ruling.

5       The California Supreme Court granted review of the appellate court's

6  decision on May 11, 2011, superseding the opinion of the Court of Appeal.  The

7  California Supreme Court's review pertained to the issue of whether the trial court

8  should have instructed the jury, as Mr. Wilkins requested, on the theory that a

9  homicide and an underlying felony do not constitute one continuous transaction for

10  purposes of the felony-murder rule if the defendant has escaped to a place of

11  temporary safety before the homicide takes place, pursuant to CALCRIM No. 3261.

12  *See People v. Wilkins*, 251 P.3d 940 (2011).

13       On March 7, 2013, the California Supreme Court reversed the opinion of the

14  Court of Appeal and remanded the case for further proceedings consistent with its

15  opinion.  The California Supreme Court's opinion held that: (1) the escape rule

16  establishes the outer limit of the "continuous transaction" theory of felony murder

17  liability for killing during flight; (2) sufficient evidence required a jury instruction

18  on the escape rule; and (3) the failure to instruct the jury on the escape rule was not

19  harmless error.  *People v. Wilkins*, 56 Cal. 4th 333 (2013).  The California Supreme

20  Court reasoned that Mr. Wilkins was at least 60 miles away from the scene of the

21  burglary when the stove fell off his truck and that he had been driving on the

22  freeway at normal speeds for about an hour before the stove fell off.  In other words,

23  a reasonable jury could have concluded that Mr. Wilkins had reached a place of

24  temporary safety before the fatal collision.  The California Supreme Court found

25  that the instruction that the first trial court gave on the "continuous transaction"

26  element of felony murder was—in absence of an instruction on the escape rule—

27  incomplete and misleading.  *Id.* at 349.  Nothing in the instruction given by the first

28  trial court informed the jury that there was any rule it must apply in determining

whether the felony and the fatal act were part of one continuous transaction or in determining whether Mr. Wilkins' flight had ended.  As the California Supreme Court held, there "is more than an abstract possibility that the instructional error affected the verdict in [Mr. Wilkins'] case." *Id.* at 351.

Prior to the retrial, Mr. Wilkins discovered that CHP officers had destroyed and altered their original traffic collision reports as described above.  The prosecution had failed to disclose this exculpatory evidence, and on July 10, 2015, Mr. Wilkins filed a motion to recuse the OCDA (including Yellin), alleging outrageous government conduct.  Upon issuance of an alternative writ, the California Court of Appeal ordered the trial court to conduct an evidentiary hearing.  At the conclusion of the evidentiary hearing, former Superior Court Judge Thomas Goethals, who presided over the retrial, ruled that Murray committed serious misconduct by not disclosing the falsification of the traffic report.  As a sanction, Judge Goethals excluded felony murder as theory of liability during the retrial. Judge Goethals found: "An opinion expressed in writing by a veteran CHP officer that [Mr. Wilkins'] conduct was not the [PCF] in this fatal collision was without question *Brady* material . . . [Mr. Wilkins] should have received the exculpatory material contained in the destroyed reports prior to his first trial pursuant to the *Brady* discovery rule.  Instead, the evidence was suppressed and later destroyed." *People v. Wilkins*, 2020 WL 64715 (Jan. 7, 2020) (quoting Super. Ct. No. 06NF2339).  This left the prosecution with the more traditional "implied malice" homicide, during which a causational jury instruction must be given.

Judge Goethals also recused Murray and Yellin from the retrial, finding that both prosecutors were deeply involved in the case when the misconduct occurred, Yellin as the case filer and the prosecutor who presented the matter on behalf of the People at the preliminary hearing, and Murray as the trial prosecutor.  The retrial against Mr. Wilkins began on or around August 17, 2017.  At the conclusion of the retrial, a jury found Mr. Wilkins guilty of second-degree murder under an implied

malice theory.  On October 27, 2017, Mr. Wilkins' sentence was reduced from "26 years to life in prison" to "16 years to life in prison."  Mr. Wilkins again appealed the jury's verdict.

On January 7, 2020, a panel sitting for the Fourth District Court of Appeal in Santa Ana ruled that the jurors at the retrial did not have enough evidence to prove that Mr. Wilkins' actions contained the implied malice needed to qualify for a second-degree murder conviction.  The implied malice theory requires proof that the actions were committed by a person who knows that his conduct endangers the life of another, and that the person acts with a conscious disregard of that danger to human life.  There was no evidence that Mr. Wilkins was speeding, making abrupt lane changes, or otherwise driving dangerously.  Thus, the panel modified the judgment to involuntary manslaughter, which carries a maximum sentence of four years.  On March 10, 2020, Mr. Wilkins was resentenced to four years for the involuntary manslaughter conviction.  By that time, Mr. Wilkins had served approximately 13 years in prison for what was ultimately a four-year sentence.  Upon his final sentencing and release, Mr. Wilkins filed a claim pursuant to the California Government Code on July 6, 2020.

## III.   <u>LEGAL STANDARD</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations."  *Id*. (citation omitted.)   "[A] well-pleaded complaint may proceed even if it appears that a recovery is very remote or unlikely."  *Id*. When considering a Rule 12(b)(6) motion to dismiss, the Court must accept all material allegations in the

1   complaint – as well as any reasonable inferences to be drawn from them – as true

2   and construe them in the light most favorable to the non-moving party. *Doe v.*

3   *United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). "[A] complaint should not be

4   dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff

5   can prove no set of facts in support of his claim which would entitle him to relief."

6   *Id.*

7   **IV.   <u>PLAINTIFFS' CLAIMS AGAINST YELLIN SURVIVE</u>**

8      **A. Plaintiffs Sufficiently Allege that OCDA Prosecutor Yellin was Deeply**

9         **Involved in Wilkins' Case When the Misconduct Occurred.**

10        Plaintiffs allege in paragraph 31 of their complaint ("Cmpl.") that on July 13,

11   2006, the prosecution filed a Complaint against Wilkins, charging him with murder;

12   that on October 30, 2006, the prosecution filed the Information against Wilkins; and

13   that the prosecution charged Wilkins with first-degree murder under the felony-

14   murder rule.  "The prosecution" referenced in paragraph 31 of Plaintiffs' complaint

15   refers to the OCDA prosecutors, including Defendant Yellin.  Plaintiffs also allege

16   that the prosecution (which would include Yellin) would not have pursued a first-

17   degree murder charge against Wilkins had Piquette not been a member of law

18   enforcement.  Cmpl. at ¶ 32.  As Plaintiffs have alleged in paragraph 41 of their

19   complaint, the original CHP traffic collision reports, which constitute exculpatory

20   evidence, were destroyed and altered, and the prosecution (including Yellin) failed

21   to disclose this exculpatory evidence.  Plaintiffs' complaint sufficiently alleges that

22   Wilkins would not have been charged with murder if the initial CHP traffic reports

23   had not been destroyed and/or altered, because the initial traffic reports did not

24   provide a basis for the felony-murder rule.  Cmpl. at ¶ 41.  Accordingly, but for the

25   first-degree murder charge, Wilkins never would have served approximately 13

26   years in prison for what was ultimately a four-year sentence.  After learning about

27   the falsified traffic reports, Wilkins filed a motion to recuse the OCDA (including

28

Yellin), alleging outrageous government conduct.  Cmpl. at ¶ 41.  Judge Goethals

recused Yellin from the case, finding that Yellin was deeply involved in Wilkins'

case at the time that the misconduct occurred, with Yellin being the case filer and

the prosecutor who presented the matter on behalf of the People at the preliminary

hearing.  Cmpl. at ¶ 42.

Implicit in Plaintiffs' factual allegations that Judge Goethals granted Wilkins'

motion that alleged outrageous government conduct by the OCDA (including

Yellin) and then recused Yellin because Yellin was "deeply involved" in the case

when the exculpatory evidence was withheld, is an allegation that Yellin knew or

should have known that the initial CHP traffic reports were destroyed and/or altered

but failed to disclose this exculpatory evidence.  Plaintiffs specifically allege in

paragraph 61 of their complaint that Yellin knew that the initial CHP traffic reports

did not identify Wilkins as the PCF of the collisions, and that the evidence presented

at trial was false and/or fabricated.  Additionally, Plaintiffs have alleged that Judge

Goethals ruled that OCDA prosecutor Murray committed serious misconduct by not

disclosing the falsification of the CHP traffic reports, and that Judge Goethals found

that Wilkins "should have received the exculpatory material contained in the

destroyed reports prior to his first trial pursuant to the *Brady* discovery rule."  Cmpl.

at ¶ 41.  The reasonable inference is that Plaintiff should have received the

exculpatory material from the prosecution, including Yellin.  Based on Judge

Goethals' ruling against Murray and recusal of both Murray and Yellin, as recited in

Plaintiffs' complaint, Plaintiffs' factual allegations sufficiently allege that Yellin

knew or should have known about the falsified traffic reports.  Plaintiffs specifically

allege in paragraph 61 of their complaint that Yellin knew that the initial CHP traffic

reports did not identify Wilkins as the PCF of the collisions, and that the evidence

presented at trial was false and/or fabricated.  If this Court finds that Plaintiffs have

not sufficiently alleged that Yellin knew or should have known that the initial CHP

traffic reports were destroyed and/or altered, or that but for Yellin's involvement, Wilkins never would have been convicted of first-degree murder, then Plaintiffs respectfully request leave to amend their Complaint to cure any deficiency identified by this Court.

## B. Yellin is Not Entitled to Absolute Immunity

Defendants argue that Wilkins' First Claim for Fabrication of False Evidence, Second Claim for Conspiracy to Fabricate Evidence, Third Claim for *Brady* Violations, Fourth Claim for Conspiracy to Interfere with Civil Rights Violations, and Fifth Claim for Malicious Prosecution, all based on 42 U.S.C. § 1983, fail to state a claim against Yellin because Yellin is immune from civil liability because of absolute prosecutorial immunity.  Plaintiffs disagree.  The Ninth Circuit has stressed that "absolute immunity is an extreme remedy, and it is justified only where "any lesser degree of immunity could impair the judicial process itself. . . Immunity attaches to "the nature of the function performed, not the identity of the actor who performed it." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 912 (9th Cir. 2012). Prosecutors and investigators only enjoy absolute immunity in limited circumstances when an alleged action is "intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein*, 555 U.S. 335, 340-41 (2009). Defendants bear the burden of demonstrating the applicability of absolute immunity. *Burns v. Reed*, 500 U.S. 478, 486-87 (1978). There are important exceptions to the rule that prosecutors have absolute immunity, particularly for "actions logically—though not necessarily temporally—prior to advocacy, such as those 'normally performed by a detective or police officer,' like gathering evidence." *Lacey* at 913.

Given absolute immunity's limited scope, courts regularly decline to apply it where, as here, prosecutors act as administrators or investigators instead of judicial advocates. *See, e.g.*, *Garmon v. County of Los Angeles*, 828 F.3d 837, 844-45 (9th

Cir. 2016); *Broam v. Bogan*, 320 F.3d 1023, 1031 (9th Cir. 2003) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 n. 5 (1993) (a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards).  As indicated above, Plaintiffs have recited sufficient facts in their complaint to show that Yellin was deeply involved in Wilkins' case at the time that the misconduct pertaining to the falsified CHP reports occurred.  Taking Plaintiffs' facts and all reasonable inferences therefrom as true, Yellin was acting as an investigator with respect to Wilkins' case, and Yellin's involvement in Wilkins' case was not only intimately associated with the judicial phase of the criminal process.  If this Court finds that Plaintiffs have not sufficiently alleged these facts, then Plaintiffs request leave to amend.  This case is in the very early stages of discovery, and Plaintiffs request an opportunity to conduct discovery on Yellin's involvement in Wilkins' case, particularly in light of Judge Goethals' recusal of Yellin from Wilkins' case upon learning of the falsified evidence and observing Yellin's involvement in Wilkins' case.

Courts employ a fact-based analysis in determining whether actions taken after a finding of probable cause are protected.  *See Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (looking to "the nature of the function performed, not the identity of the actor who performed it" in deciding whether absolute immunity applies). In *Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26, 28 (1st Cir. 1995), the plaintiff was arrested, convicted, and imprisoned for a murder that he did not commit.  When a post-conviction investigation initiated by Guzman's father uncovered evidence of Guzman's innocence, his father urged prosecutors to further investigate the exculpatory evidence, but prosecutors failed to act for several months.  When prosecutors finally reopened the investigation, it led to witness confessions, Guzman's exoneration, and his eventual release from prison.  Guzman sued the prosecutors for their delay in reopening the investigation.  The First Circuit held that

the prosecutors were not "entitled to absolute immunity for any delays or inadequacies in their conduct of the investigation."  The Court reasoned that since the only nexus between the post-conviction investigation and the quasi-judicial prosecutorial function would be a function of hindsight (that the investigation corroborated evidence of Guzman's innocence), there was no causal relationship and no absolute immunity.  The Court further found no "historical or common-law support for extending absolute immunity to the conduct of an [] investigation that is only contingently associated with the judicial phase of the criminal process" and reiterated the United States Supreme Court's disinclination "to extend absolute immunity from liability under § 1983." *Id*. at 30, (citing *Malley v. Briggs*, 475 U.S. 335, 342 (1986)); *see also Houston v. Partee*, 978 F.2d 362, 367 (7th Cir. 1992). The Court also reasoned that any investigative conduct for the purpose of vindicating Guzman was conduct separate from the judicial phase of the criminal process. *Id*. at 30-31.  And, the court reasoned that had the defendants not been prosecutors, they would not have been entitled to immunity for the investigation, noting that "[t]he defendants should not enjoy absolute immunity for the same conduct merely because they happen also to [be] . . . [p]rosecutor[]s. *Id*. at 31 (citing *Burns v. Reed*, 500 U.S. 478, 495 (1991)).

In *Houston v. Partee*, 978 F.2d 362, 367 (7th Cir. 1992), two men were convicted of murder and sentenced to 35 years in prison.  Thereafter, a witness told law enforcement that the two men were innocent and identified the real perpetrators. The real perpetrators confessed, and the two men were released after serving five years in prison.  The two men then sued the prosecutors, alleging that while the prosecutors obtained evidence of their innocence, they failed to disclose it while the men served a prison term for a crime that they did not commit.  The prosecutors argued that they were entitled to absolute immunity.  The Seventh Circuit disagreed. Relying on the Supreme Court's "functional approach" to immunity (a prosecutor's entitlement to absolute immunity is grounded in the nature of the functions he was

performing in the case), the Seventh Circuit reasoned, "when the defendant prosecutors discovered the evidence exculpating Houston and Brown, they were not functioning as prosecutors." *Id*., at 366 (citing *Burns*, 500 U.S. at 478; *Mitchell v. Forsyth*, 472 U.S. 511, 521 (1985)).  As with Defendant Yellin in this case, who charged Wilkins with first degree murder and was then recused from the case, the prosecutors in *Houston* were no longer involved in the case.  *Houston*, at 366.  The prosecutors' knowledge of and failure to act on the evidence of innocence "thus had no connection to their 'role as advocate for the State.'" *Id*., at 366-67 (citing *Burns*, 500 U.S. at 478; *Allen v. Lowder*, 875 F.2d 82, 86 (4th Cir. 1989) (district attorney "cannot seriously argue that his actions resulted from any advocacy role in rehabilitating [the plaintiff's] conviction" because he "did not himself participate in the presentation of the state's appeal").

The Ninth Circuit has joined the Fourth and Seventh Circuits in declining to extend absolute immunity to prosecutors for conduct that occurs when they are not acting as prosecutors or involved in advocacy for the state. Although an unpublished opinion, in *Tennison v. City and County of San Francisco*, 2006 WL 733470 (C 04-0574 CW, C 04-1643 CW) (March 22, 2006), one of the Plaintiffs, Goff, filed suit against the prosecutor for failing to disclose exculpatory evidence obtained post-conviction.  The prosecutor moved for summary judgment, arguing that he was entitled to absolute immunity.  Relying on *Houston*, the Ninth Circuit found that the prosecutor was not entitled to absolute immunity because, "at the time Butterworth received the tape of Ricard's confession, Butterworth was not acting as a prosecutor in regard to Goff.  Because the Attorney General represents the people of the State on appeal, even though Goff's appeal was pending, Butterworth would not have been involved in it." *Id*. at *26.

The foregoing cases show that there are exceptions to absolute immunity, and that whether the exceptions apply depends on the facts of the case.  Plaintiffs have

recited sufficient facts in their complaint to show that Yellin was deeply involved in Wilkins' case at the time that the misconduct pertaining to the falsified CHP reports occurred.  Plaintiffs allege that the prosecution (Yellin) would not have pursued a first-degree murder charge against Wilkins had Piquette not been a member of law enforcement.  Cmpl. at ¶ 32.  Plaintiffs have also alleged that CHP Chief Beeuwsaert told OCDA prosecutor Murray about the changed traffic reports, and that Murray told Chief Beeuwsaert that it did not matter because Wilkins was a fleeing felon, and the prosecution intended to pursue a conviction against Wilkins under the felony-murder rule.  Plaintiffs have also alleged that the CHP traffic reports were falsified and fabricated because the prosecution (including Yellin) needed all of the CHP traffic reports to have the same PCF attributed to Wilkins in order to proceed on a felony-murder theory.  Cmpl. at ¶ 28.  These facts give rise to the reasonable inference that both prosecutors, Yellin and Murray, knew about the falsified traffic reports during an investigative phase not intimately associated with the judicial process, before Yelling became an "advocate" for the purposes of the immunity.  The reasonable inference is that Yellin conspired with the other defendants named in Plaintiffs' complaint to ensure that the CHP reports were falsified to support the prosecution's intended felony-murder theory prior to becoming an "advocate."  Yellin is therefore not entitled to absolute or prosecutorial immunity.  Yellin does not request qualified immunity in his Motion.

**C. Yellin is Not Immune Under Cal Gov't Code 821.6**

Plaintiffs disagree that Yellin is immune under section California Government Code section 821.6.  The scope of immunized conduct under §821.6 only covers the institution of a prosecution or judicial proceeding.  Here, as set forth above, Plaintiffs have recited facts in their complaint to indicate that Yellin's conduct was not limited to the institution of a prosecution or judicial proceeding.  The reasonable inference from Plaintiffs' facts is that Yellin conspired with Morrison, Murray and

Vandiver to have the initial CHP traffic collision reports shredded and falsified so that the prosecution could pursue a first-degree murder conviction against Wilkins for the death of a law enforcement officer (Piquette) based on the felony-murder theory.  If this is unclear from Plaintiffs' complaint, then Plaintiffs request leave to amend.  Additionally, Cal. Govt. Code §815.2(b) only immunizes the County if Yellin is immune under §821.6.  Since Yellin is not immune under §821.6 for all of the conduct that Plaintiffs allege in their complaint, the immunity also does not extend to the County.

Additionally, section 821.6 does not confer immunity for false imprisonment. *Gillan v. City of San Marino*, 55 Cal.Rptr.3d 158, 171 (Cal. App. 2 Dist. 2007) (citing *Sullivan v. County of Los Angeles,* 12 Cal.3d 710, 719–22 (1974)).  "The California Supreme Court in *Sullivan* concluded based on the statutory language and legislative history that section 821.6 was not intended to change the common law rule, preserved in Government Code section 820.4, that a public employee can be liable for false imprisonment." *Id*.  The test for false imprisonment liability . . . requires either that the [official] have actual knowledge that the imprisonment of the plaintiff is unlawful or alternatively that he have some notice sufficient to put him, as a reasonable man, under a duty to investigate the validity of the incarceration." *Sullivan v. County of Los Angeles*, 527 P.2d 865, 870 (Cal. 1974) (citing cf. Rest.2d Torts, §45, com. b.).  Under California law, a claim for false imprisonment may be grounded upon a prolonged detention, particularly where there is a special relationship between the government official and the plaintiff.  *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1380 (9th Cir. 1998) (reversing summary judgment where the LAPD allowed plaintiff to remain in jail in Mexico after they knew or should have known that he was the wrong man and finding a special relationship where the LAPD was responsible for Martinez' arrest and for providing information to Mexican authorities) (citing *Wallace v. City of Los Angeles*, 12 Cal. App. 4th

1385, 1403–04 (1993) (police had special relationship to witness in criminal case)). Accordingly, Yellin is not immune from liability for Wilkins' claim for false imprisonment based on his prolonged detention.  Wilkins' prolonged detention of approximately 13 years on what was ultimately only a four year sentence was caused by Yellin's misconduct as described above, including: Yellin's role in conspiring with Vandiver, Murray, and Morrison prior to Yellin presenting the case, to ensure that the PCF in each of the fabricated CHP traffic reports were consistent, which required destruction of the initial reports; Yellin filing charges and presenting a case based on fabricated evidence; and Yellin failing to take action to rectify this error after the fabricated evidence was presented.

Nor does § 821.6 confer immunity for a negligence claim that is "based ... on the same facts," "derivative of," and "related" to a false imprisonment claim. *Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009) (holding that California's statutory immunities do not apply to state law claims for negligence) (citing *Martinez*, 141 F.3d at 1373 and *Asgari v. City of Los Angeles*, 15 Cal.4th 744 (1997)).  Yellin is therefore also not immune from liability for his negligence pursuant to §821.6.

## V.   **PLAINTIFFS' CLAIMS AGAINST THE COUNTY SURVIVE**

### A. **Wilkins' Municipal Liability Claims Under 42 U.S.C. 1983**

Plaintiffs' claims for municipal liability against the County (claims 6, 7, 8) arise under three separate theories of liability based on all of the misconduct by Yellin, Murray, and Vandiver described in the complaint and in the above statement of facts.  Vandiver was, at all relevant times, an investigator for the OCDA. Heckenkemper, who wrote the initial CHP reports that were destroyed, told Vandiver that his report had been changed and that he did not agree with Sgt. Morrison's PCF.  Vandiver responded, "I don't want to hear about it," or words to that effect.  As set forth in Plaintiffs' complaint and statement of facts, above,

Plaintiffs allege that these three individual defendants engaged in a variety of misconduct, and Defendants' argument that the County is not liable for any of the conduct of any of Vandiver, Murray, or Yellin on a theory of municipal liability is misplaced.

### 1. Ratification

Liability under a § 1983 *Monell* theory may attach when a final policymaker ratifies a subordinate's unconstitutional action and the basis for it. *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999); *see generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). To show ratification, a plaintiff must prove that "authorized policymakers approve a subordinate's decision and the basis for it." *Christie*, 176 F.3d at 1239 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality)); s*ee also Lytle v. Carl*, 382 F.3d 978, 987–88 (9th Cir. 2004) ("[R]atification requires both knowledge of the alleged constitutional violation, and proof that the policymaker specifically approved of the subordinate's act."); *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002); *See also* Ninth Cir. Model Jury Instruction 9.6.

Here, Plaintiffs have satisfied the pleading standards set forth in Rule 8 by alleging each of the foregoing elements in their complaint. First, Plaintiffs have alleged that Yellin, Vandiver, Murray, and OCDA DOES acted under color of state law. Second, Plaintiffs have named OCDA SUPERVISORY DOES as policymaking individuals working under the authority of the County and intend to discover the identities of these individuals after discovery opens. Third, Plaintiffs have adequately pled that Yellin's and Murray's actions deprived Wilkins of his constitutional rights. Finally, Plaintiffs have alleged that a final policymaker determined that Yellin's, Vandiver's and Murray's actions were within OCDA policy, and have alleged that Yellin, Murray, and Vandiver were not penalized in connection with the deprivation of Wilkins' civil rights. Cmpl. at ¶¶ 99-105.

## 2.  Failure to Train

With respect to Plaintiff's seventh claim for relief, a failure to train claim is properly alleged as follows: (1) the plaintiff was deprived of a constitutional right; (2) the municipality had a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons with whom [its police officers] are likely to come into contact"; and (3) the plaintiff's constitutional injury would have been avoided had the municipality properly trained those officers.  *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007).  Based on the evidence presently available to Plaintiffs at this time, it is a reasonable inference that the County failed to train its employees at the OCDA, including failing to train with respect to not presenting false and fabricated evidence, not withholding exculpatory evidence, and not conspiring to have CHP reports altered.  Plaintiffs contend that their *Monell* claims should not be disposed of so early on in the case, and request that they be permitted to conduct discovery on this issue.

## 3.  Unconstitutional Custom, Practice, and Policy

Plaintiffs may establish liability under *Monell* by showing a constitutional violation caused by a policy, custom, or practice of the public entity.  *Monell*, 436 U.S. 658.  A policy is a formally adopted rule, statute or guideline adopted by a public entity. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  A custom or practice are more informal in nature, and *Monell* liability may be imposed for a constitutional violation of resulting from persistent yet informal conduct of public employees.  *Shaw v. California Dept. of Alcoholic Beverage Control*, 788 F.2d 600 (9th Cir. 1986) (pattern of police misconduct for repeated discriminatory law enforcement acts against black bar owners).  *Monell* liability may also be based on a policy of inaction that amounts to a failure to protect constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).  The specific elements of this claim for relief as they apply to Wilkins' case are: (1) the County had an official policy/custom or even an unofficial

*defacto* policy; (2) Yellin, Murray and OCDA DOES were employed by the County; (3) Yellin and Murray intentionally engaged in specific conduct; (4) such conduct violated Wilkins' civil rights; and (5) Yellin's and Murray's actions were the result of the County's policies.

Here, Plaintiffs' eighth claim for relief plainly alleges all of those elements, satisfying the pleading standard set forth in Rule 8.  As to the first element, in paragraph 121 of their Complaint, Plaintiffs set forth specific customs, policies, and/or practices alleged to have caused the constitutional violation in this case. The second element is met because Complaint alleges that Yellin and Murray were County employees and acting under color of state law. The third element is met because the Complaint alleges that Yellin, Vandiver, and Murray intentionally engaged in the following specific conduct: pursuing a first-degree murder charge against Wilkins because Piquette was a member of law enforcement; conspiring with respect to the destruction and fabrication of the CHP traffic collision reports (Cmpl. at ¶¶ 59-61); presenting false evidence at trial when they knew that evidence was false (Cmpl. at ¶¶ 36, 51); and withholding exculpatory evidence (Cmpl. at ¶ 69).  The fourth element is met because Plaintiffs' complaint sufficiently alleges that Wilkins would not have been charged with murder if the initial CHP traffic reports had not been destroyed and/or altered, because the initial traffic reports did not provide a basis for the felony-murder rule.  Cmpl. at ¶ 41.  The final element is also met because paragraphs 123-24 allege that the unconstitutional policies that led to Wilkins being overcharged caused Plaintiffs' damages.  These facts are not simply general conclusory allegations.  These allegations set forth the policies, practices, and customs that are alleged to be the causal link and moving force behind the constitutional violations at issue in this case.  The specificity of these policies, practices, and customs have met the sufficiency standards set forth by Rule 8 and Rule 12(b)(6).

### B. Plaintiffs' State Law Claims for Vicarious Liability Against the County Survive

Plaintiffs rely on California Government Code section 815.2(a) to hold the County vicariously liable for the acts of its employees, including Yellin, Vandiver and Murray. Defendant County's arguments are misplaced because Plaintiffs do not assert these claims directly against the County. Additionally, Murray's and Vandiver's claims are not at issue in the instant motion, and therefore no finding can be made on this motion alone that the County is not vicariously liable for the misconduct of any of its employees named as defendants.

## VI.    <u>WILKINS ADEQUATELY PLED HIS BANE ACT CLAIM</u>

The Ninth Circuit stated in *Reese v. County of Sacramento* that in order for a plaintiff to maintain a claim under California Civil Code ¶ 52.1, "it is not necessary for the defendants to have been 'thinking in constitutional or legal terms at the time of the incidents, because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights.'" 888 F.3d 1030 (9th Cir. 2018) (quoting *United States v. Reese*, 2 F. 3d 870 (9th Cir. 1993)). Here, there are a number of facts that establish that Yellin acted with reckless disregard for Mr. Wilkins' constitutional rights no matter which standard is applied.

## VII.    <u>WILKINS ADEQUATELY PLED HIS BRADY CLAIMS</u>

Establishing a *Brady* violation requires proof that: evidence was (1) suppressed, (2) exculpatory, and (3) material. *Hovey v. Ayers*, 458 F.3d 892, 916-17 (9th Cir. 2006). Evidence is "exculpatory" when it is favorable to the accused, whether because it tends in any way to negate guilt, or because it is impeaching. *See United States v. Bagley,* 473 U.S. 667, 676 (1985); *Strickler v. Greene*, 527 U.S. 263, 263 (1999) (finding that a suppressed document detailing an eye witnesses' description of the incident to detectives as "trivial," whereas the witnesses trial testimony described it as "terrifying" was "unquestionably" impeaching.).

"[E]vidence is material 'if there is a reasonable probability that, had the evidence. different.'" *Strickler*, 527 U.S. at 280-81 (citing *Bagley*, 473 U.S. at 682); *see also Kyles v. Whitley,* 514 U.S. 419 (1995). The disclosure mandate under *Brady* runs with the same force and effect to evidence "known only to police investigators and not the prosecutor." *Kyles*, 514 U.S. at 438. Additionally, a court may look to the cumulative effect of suppressed evidence to determine materiality, and is not confined to judge each individual non-disclosure in a vacuum when so doing. *Id.* at 438-39 (refusing to raise the threshold of materiality under the *Bagley* standard, and reinforcing the conclusion that violations may be viewed in the aggregate to determine materiality under *Brady*).  Plaintiffs have adequately pled all three elements of Wilkins' Brady violation claim in paragraphs 67 through 74 of his complaint and in the statement of facts in support of each claim.  Therefore, this claim should not be dismissed.

## III.      PLAINTIFFS ADEQUTELY PLED THEIR CLAIMS FOR PUNITIVE DAMAGES

Plaintiffs have alleged throughout their complaint that the acts of Defendant Yellin was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights and safety of Wilkins, and therefore warrants the imposition of exemplary and punitive damages.  Plaintiffs have therefore properly pled their punitive damages claim, in conjunction with their allegations as set forth in the complaint and in the statement of facts above showing the deliberate indifference of the individual defendants.

In *Smith v. Wade*, 461 U.S. 30 (1983), the Supreme Court concluded that punitive damage awards "did not require a showing of actual malicious intent; rather, [federal and state courts] permitted punitive awards on variously stated standards of negligence, recklessness, or other culpable conduct short of actual malicious intent." 461 U.S. at 45; *see also Wright v. Jones*, 907 F.2d 848, 852 (8th

1   Cir. 1990) (holding that a finding of "willful or malicious conduct" is not a

2   necessary prerequisite to punitive liability). In *Dang v. Cross*, 422 F.3d 800, 806–07

3   (9th Cir. 2005), the Ninth Circuit he *Wade* Court noted cases applying various

4   formulations of the standards for punitive damages awards that existed at the time

5   Congress enacted § 1983, including "malicious or wanton misconduct or culpable

6   neglect," *Welch v. Durand*, 36 Conn. 182, 185 (1869), conduct done "wantonly, or

7   oppressively," *Cowen v. Winters*, 96 F. 929, 935 (6th Cir. 1899) (citations omitted);

8   *Berry v. Fletcher*, 3 F.Cas. 286, 288 (C.C. Mo. 1870); *Fotheringham v. Adams Exp.*

9   *Co.*, 36 F. 252, 253 (E.D. Mo. 1888), "gross negligence," *Frink & Co. v. Coe*, 4

10  Greene 555, 1854 WL 228, at *4 (Iowa 1854); *Maysville & L.R. Co. v. Herrick*, 76

11  Ky. 122, 127 (1877), "reckless negligence," *Florida Ry. & Nav. Co. v. Webster*, 25

12  Fla. 394, 5 So. 714, 719 (1889), and "reckless disregard of the rights of others,"

13  *Jacobus v. Congregation of Children of Israel*, 107 Ga. 518, 33 S.E. 853, 855

14  (1899). Importantly, the *Wade* Court noted that in modern tort law, courts continue

15  to apply the same standards for punitive damages awards. *Dang v. Cross*, 422 F.3d

16  at 806–07 (citing *Id*. at 46). The Ninth Circuit in *Dang* also noted that there is "no

17  reason why a person whose federally guaranteed rights have been violated should be

18  granted a more restrictive remedy than a person asserting an ordinary tort cause of

19  action." 422 F.3d at 806-07 (quoting *Smith v. Wade, supra*, at 48–49).

20      Moreover, whether Plaintiffs are entitled to punitive damages is a question for

21  the jury to consider after the presentation of all the evidence at trial. *Herrera v. Las*

22  *Vegas Metropolitan Police Dept.*, 298 F. Supp. 2d 1043, 1055-56 (D. Nev. 2004)

23  (the appropriateness of punitive damages must be determined after the presentation

24  of all the evidence at trial).  Therefore, this Court should not strike Plaintiffs' claim

25  for punitive damages.

26  **IX.   REQUEST TO AMEND**

27      As discussed at length above, Plaintiffs have sufficiently alleged their claims.

28  Plaintiffs' "complaint should not be dismissed for failure to state a claim [because it

does not appear] beyond doubt that [Wilkins] can prove no set of facts in support of his claim which would entitle him to relief." *Doe*, 419 F.3d at 1062. To the extent the Court finds the allegations are deficient, Plaintiffs respectfully request that the Court grant them leave to amend any deficiencies in the Complaint. Federal Rule of Civil Procedure 15(a)(2) directs, "The court should freely give leave when justice so requires."

## X.   <u>CONCLUSION</u>

For each of the foregoing reasons, Plaintiffs respectfully request an order denying Defendant's motion.  Plaintiffs further request an order allowing them to file an amended complaint if this Court identifies any deficiencies Plaintiffs may correct in an amended pleading.

DATED: August 27, 2021                    LAW OFFICES OF DALE K. GALIPO

/s/ Renee V. Masongsong
_____
Dale K. Galipo
Renee V. Masongsong
*Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANTS COUNTY'S AND YELLIN'S MOTION TO DISMISS