UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO. 8:20-cv-02417-JLS-DFM

COLE WILKINS v. WESLEY
VANDIVER; JOSEPH MORRISON

**ORDER DENYING DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT (Docs. 77, 78)**

Before the Court are two Motions for Summary Judgment: one filed by Defendant Joseph Morrison (Morrison Mot., Doc. 77), and the other filed by Defendant Wesley Vandiver (Vandiver Mot., Doc. 78).  Plaintiff opposed both, and Defendants replied. (Opp., Doc. 88; Morrison Reply, Doc. 89; Vandiver Reply, Doc. 93.)  Having considered the parties' submissions and heard oral argument, the Court now DENIES the motions.

## I.    BACKGROUND

This case stems from the prosecution of Plaintiff Cole Wilkins. [1]  Early in the morning of July 7, 2006, Wilkins was driving westbound on the 91 freeway with stolen appliances in the back of his pickup truck, and a stove fell from the back of the truck into the road.  (Plaintiff's Statement of Genuine Disputes of Material Fact re Morrison ("Pl's SGD Morrison"), Doc. 88-2 at ¶ 1.)  Several hundred cars passed through the area where the stove had fallen and were able to avoid it safely.  (*Id.* at ¶ 65.)  However, three motorists, Lay, Thomas, and Howard, were involved in non-fatal collisions.  (*Id.* at ¶¶ 2, 17.)  A Riverside County sheriff's deputy, Piquette, swerved to avoid the stove and collided with a cement truck, which overturned, killing Piquette.  (*Id.* at ¶ 3.)

The same day as the collisions, California Highway Patrol ("CHP") Officer John Heckenkemper prepared a traffic collision report for the non-fatal collision involving motorists Thomas and Howard and identified the primary collision factor ("PCF") as "unsafe speed for conditions."  (*Id.* at ¶ 17.)  Officer Bernardin prepared a report as to the fatal collision involving Piquette.  (*Id.* at 26.)  On or after July 10, 2006, Defendant

---

[1] As an initial matter, the Court addresses the parties' numerous and often boilerplate evidentiary objections.  (*See* Morrison Objections, Doc. 91; Vandiver Objections, Doc. 95.)  In such instances, it is "unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised."  *Doe v. Starbucks, Inc.*, No. 08-0582, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).  To the extent that the Court relies on objected-to evidence, the evidence is admissible and the relevant objections are overruled.  *See Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010).  "At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

Sergeant Morrison either revised or rewrote Officer Heckenkemper's report in order to change the PCF to "other than driver" and to include as "causes" of the collision poor lighting, the condition of the road, and the dark color of the object in the freeway.  (*Id.* at ¶ 21.)  He also added a recommendation for criminal prosecution.  (Morrison Deposition ("Morrison Depo.", Doc. 88-4 at 31:2-9, 34:11-15.)  Morrison also wrote or revised the report based on information gathered by Officer Bernardin regarding the non-fatal collision involving the motorist Lay to report the PCF as "other than driver" and listed as "causes" poor lighting, the condition of the road, and the dark color of the object in the road.  (Pl's SGD Morrison at ¶ 22.)  Morrison then destroyed the initial reports.  (*Id.* at ¶ 25.)

Officer Bernardin, who was tasked with drafting the report regarding Piquette's fatal collision, was of the opinion that the PCF in that collision was that the driver was traveling at "unsafe speed for the conditions."  (*Id.* at ¶ 26, 28.)  However, Morrison instructed him that the PCF in the report should be "other than driver."  (*Id.* at ¶ 29; Morrison Depo. at 20:11-15.)

The parties dispute the extent to which Officer Heckenkemper's report was finalized before Morrison altered it.  Wilkins contends that Officer Heckenkemper completed his report before he left for vacation, had it reviewed by an officer with the Accident Investigation Unit, and it had been signed off on.  (Pl's SGD Morrison at ¶ 19.)  Morrison contends that CHP Officer Scott Taylor reviewed but did not sign Officer Heckenkemper's report.  (*Id.*)

On July 13, 2006, the Orange County District Attorney's office ("OCDA") filed a criminal complaint against Wilkins alleging, among other things, first degree murder under the felony-murder rule in the death of Piquette.  (Pl's SGD Morrison at ¶ 34.)  At some point near the beginning of the investigation, Morrison met with members of the OCDA, including an investigator.  (Morrison Depo. at 24:11-25:16; 37:4-12.)

The prosecutor asked Defendant Wesley Vandiver to look into the issue of causation of the fatal crash in anticipation that the defense would call a causation expert at trial.  (Plaintiff's Statement of Genuine Disputes of Material Fact re Vandiver ("Pl's SGD Vandiver"), Doc. 88-23 at ¶ 21.)  As part of his investigation, he reviewed the altered fatal collision report by Officer Bernardin.  (*Id.* at ¶ 27.)  While the first trial was in progress, Vandiver met with Officer Heckenkemper at the location of the freeway where the stove had fallen from Wilkins's vehicle.  (*Id.* at ¶ 23.)  Officer Heckenkemper claims that during that meeting, he told Vandiver that he did not agree with Morrison's PCF and that the reports had been changed.  (*Id.* at ¶ 25.)  Officer Heckenkemper also testified in state court that he informed Vandiver that Officer Bernardin also did not agree with the PCF in the fatal collision report.  (Heckenkemper Apr. 26 Testimony, Doc. 88-16 at 18:9-17.)  He stated that Vandiver responded with something along the lines of "I don't want to hear about it."  (*Id.* at 19:4-12.)

Sergeant Morrison testified at both the preliminary hearing and during the trial itself.  (Pl's SGD Morrison at ¶¶ 35, 36.)  Officer Heckenkemper also testified at the trial, and Officer Bernardin did not.  (*Id.* at ¶¶ 37, 38.)  Vandiver testified for the prosecution at trial regarding his opinion that the stove was the cause of the fatal collision, rebutting the defense expert's opinion that Piquette's unsafe speed was the cause.  (*Id.* at ¶ 42; Vandiver Deposition, Doc. 88-5 at 18:3-23.)

During the trial, CHP Chief Steven Beeuwsaert alerted the prosecutor about the altered collision reports.  (*Id.* at ¶ 44.)  The prosecutor told Beeuwsaert that it did not matter because the prosecutor intended to pursue a conviction against Wilkins under the felony-murder rule as a fleeing felon.  (*Id.* at ¶ 45.)  Ultimately, on May 5, 2008, the jury convicted Wilkins of first-degree murder under the felony-murder rule on the theory that Piquette's death occurred during the commission of a burglary, and Wilkins was sentenced to twenty-six years to life in prison.  (*Id.* at ¶¶ 46, 47.)  Following an appeal where the California Court of Appeal affirmed the trial court's ruling, the California Supreme Court

found that the trial court's failure to instruct the jury on the "escape rule" to felony murder was not harmless error because Wilkins was at least 60 miles from the scene of the burglary when the stove fell off of his truck, and remanded the case for a new trial on March 7, 2013. (*Id.* at ¶¶ 50, 51.)

On July 10, 2015, Wilkins filed a motion to recuse the OCDA from the second trial alleging outrageous government conduct based on, inter alia, the failure to turn over information regarding the changed collision reports. (*Id.* at ¶ 52.) The trial court held an evidentiary hearing on the matter and in January 2017 concluded that Deputy District Attorney Michael Murray had committed serious misconduct in not disclosing that the collision reports were changed, and recused Murray and Deputy District Attorney Larry Yellin as prosecutors on the case. (*Id.* at ¶ 53.) In May 2017, the trial court ordered that the OCDA could not pursue a felony-murder theory at the second trial as a sanction. (*Id.* at ¶ 54.) In the second trial, evidence was presented to the jury regarding the changed collision reports. (*Id.* at ¶ 56.) After the second trial in August 2017, the jury found Wilkins guilty of second-degree murder under an implied malice theory, and his sentence was reduced to sixteen years to life in prison. (*Id.* at ¶¶ 55, 57.)

On appeal the Fourth District Court of Appeal ruled on January 7, 2020 that the jurors in the second trial had insufficient evidence to support the conviction because there was no evidence that Wilkins was speeding or driving dangerously. (*Id.* at ¶ 59.) The Court of Appeal modified Wilkin's conviction to involuntary manslaughter, and on March 10, 2020, Wilkins was resentenced to four years in prison for the involuntary manslaughter conviction; at that point, he had served approximately thirteen years in custody. (*Id.* at ¶¶ 60-62.) Wilkins filed the complaint in the instant action on December 23, 2020. (Complaint, Doc. 1.) Defendants Morrison and Vandiver now move for summary judgment against Wilkins.

## II.   LEGAL STANDARD

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is proper "if the [moving party] shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-moving party's favor, and a fact is "material" when it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. But "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

The role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried. The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

## III.   DISCUSSION

Morrison and Vandiver both argue that Wilkins's claims are barred by the statute of limitations. (Morrison Mot. at 18; Vandiver Mot. at 17.) Morrison further argues that he should be granted summary judgment on the fabrication of evidence, conspiracy to interfere with civil rights, *Brady*, and conspiracy to commit *Brady* violation claims, and

that he is entitled to qualified immunity. Vandiver argues that he should be granted summary judgment on the fabrication of evidence, conspiracy, and *Brady* claims, that he is entitled to qualified immunity, and that the claim for punitive damages has no merit. The Court addresses these arguments in turn.

### A. Statute of Limitations

We look to state law for the statute of limitations, *see Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir. 1991), while federal law supplies the date of accrual, *see Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015). The parties agree, correctly, that the applicable statute of limitations under California law is two years. *See Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004). The parties disagree, however, as to when the clock started running for Wilkins to bring his claims and whether any tolling is applicable.

### 1. Accrual

The parties offer several different dates for when Wilkins's cause of action in the instant case accrued. Morrison argues that the limitations clock started, at the latest, in July 2015 when Wilkins filed the motion to recuse the OCDA. (Morrison Mot. at 19.) Vandiver argues that the statute of limitations began to run on Wilkins's claims either on May 17, 2017, when the trial court issued its order excluding felony murder as a theory of liability against Wilkins in the second trial, or at the latest on September 6, 2017 when the jury rendered its verdict in the second trial. (Vandiver Mot. at 21-23.) For his part, Wilkins contends that the limitations clock started on March 10, 2020, when he was resentenced following the appellate court's reduction of his second-degree murder conviction to involuntary manslaughter. (Opp. at 14-15.)

The disagreement as to the date of accrual stems in part from the applicability of what is known as the *Heck* bar in § 1983 litigation. In *Heck v. Humphrey*, the Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a

conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 486–87 (1994). The Court clarified the application of *Heck* to claims of fabrication of evidence in *McDonough v. Smith*, finding that the statute of limitations for such claims begins to run "[o]nly once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated." 139 S. Ct. 2149, 2158 (2019). The Ninth Circuit has held that claims for *Brady* violations similarly are subject to the *Heck* bar because they necessarily imply the invalidity of the conviction or sentence. *See Rosales-Martinez v. Palmer*, 753 F.3d 890, 896 (9th Cir. 2014). "The proper approach in our federal system generally is for a criminal defendant who believes that the criminal proceedings against him rest on knowingly fabricated evidence to defend himself at trial and, if necessary, then to attack any resulting conviction through collateral review proceedings." *McDonough*, 139 S. Ct. at 2159.

The unusual circumstances of this case make this seemingly straightforward rule somewhat tricky to apply. Here, Wilkins's first conviction was overturned for instructional error, not for anything to do with the altered police reports. The trial court first had the opportunity to consider the effect of the altered reports during the pretrial litigation leading up to the second trial after Wilkins filed his motion to recuse the OCDA. The trial court conducted an evidentiary hearing and concluded there was "compelling evidence" of "serious misconduct" which required recusing the two prosecutors in the case but did not require recusal of the entire OCDA. (Jan. 13, 2017 State Trial Court Order, Doc. 88-9 at 7.) The trial court heard further evidence in order to rule on Wilkins's motion to dismiss the case due to outrageous government conduct; the trial court denied the motion but ordered that felony-murder be excluded as a theory at the new trial. (May 17, 2017 State Trial Court Order, Doc. 81-1 at 215-16, 219.) At the second trial, jurors heard

8

evidence regarding the alteration of the reports.  After conviction at the second trial, Wilkins argued on appeal that the trial court erred in not recusing the entire OCDA and in denying his motion to dismiss the information for outrageous government misconduct.  *See People v. Wilkins*, No. G055603, 2020 WL 64715, at *3 (Cal. Ct. App. Jan. 7, 2020).  The appellate court affirmed those rulings and modified Wilkins's conviction to manslaughter and remanded for resentencing due to insufficient evidence to sustain the second-degree murder conviction.  *See id.* at *5, *10.  The question the Court must now resolve is when, among these various rulings and appeals, the proceedings ended in Wilkins's favor such that he could bring the § 1983 claims that are the subject of this case.

The Court is guided by the rationale motivating *Heck* and *McDonough*.  In *Heck*, the Court explained that a plaintiff whose conviction had not been overturned or invalidated could not bring a § 1983 claim for malicious prosecution because doing so would "permit a collateral attack on the conviction through the vehicle of a civil suit."  512 U.S. at 484.  In barring parallel litigation in federal and state court, the Court was adhering to "a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction."  *Id.*

In *McDonough*, the Court considered that case of a § 1983 plaintiff who alleged that fabricated evidence was used at both his first trial, which ended in a mistrial, and his second trial, which ended in an acquittal.  139 S. Ct. at 2154.  In reversing the Second Circuit's holding that his cause of action accrued when he learned about the misconduct and when he suffered a loss of liberty due to it, the Court highlighted the importance of "avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments."  *Id.* at 2157.  The Court also noted that starting the statute of limitations while criminal charges were pending would make "criminal defendants … face an untenable choice between (1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of prosecuting them."  *Id.* at 2158.

The paramount consideration, thus, is when Wilkins could have brought his claims without risking conflicting state and federal court rulings regarding the altered collision reports. This excludes Morrison's proffered accrual date of July 2015, when Wilkins filed his motion to recuse the OCDA. Bringing the claim then would have risked conflicting state and federal court rulings as to whether there were *Brady* violations in the case. Moreover, had the state court not found *Brady* violations and disallowed the felony-murder theory, the prosecution could have potentially relied on the same evidence and gotten a conviction on the same theory as the first trial. Such an outcome would not be a "favorable termination" that would enable Wilkins to bring a § 1983 lawsuit on the basis of *Brady* violations and fabrication of evidence.

Morrison argues that the *Heck* bar does not even apply in this case after 2013, when Wilkins's conviction was overturned, which Morrison argues was sufficient to satisfy *Heck*. (Morrison Reply at 17-18.) He relies on *Wallace v. Kato*, a case where the Supreme Court held that *Heck* did not bar accrual of the plaintiff's claim in a § 1983 lawsuit for false imprisonment as soon as the alleged false imprisonment occurred. 549 U.S. 384, 392-94 (2007). The Court declined to find that "an action which would impugn *an anticipated future conviction* cannot be brought until that conviction occurs and is set aside." *Id.* at 393 (emphasis in original). However, as the Court explained later in *McDonough*, *Wallace* involved a false-arrest claim, which "has a life independent of an ongoing trial or putative future conviction—it attacks the arrest only to the extent it was without legal process, even if legal process later commences." *McDonough*, 139 S. Ct. at 2159. The Court thus distinguished it from claims that "center[] on evidence used to secure an indictment and at a criminal trial." *Id.* Wilkins's claims fall in the latter category, and, on the date in which he filed his motion to recuse the OCDA, prosecution was not merely "anticipated," it was ongoing. The rule Morrison asks us to adopt – finding that *Heck* poses no bar to a civil suit which could contradict or impugn an ongoing state criminal prosecution – would eviscerate *Heck* and is contrary to the Court's holding

10

in *McDonough*.  The Ninth Circuit rejected a similar argument in *Bradford*, where it held that a plaintiff's statute of limitations for claims of fabrication of evidence did not begin to run after his conviction was vacated because he remained subject to the same charges based on the same evidence following the vacatur.  803 F.3d at 386-89.[2]

Vandiver's proffered dates of either when the trial court excluded felony-murder as a theory of liability or when the jury rendered its verdict in the second trial present a closer case.  At that point, the trial court had ruled that a *Brady* violation had occurred and felony-murder was taken off the table.  However, after the conclusion of the second trial, Wilkins appealed the trial court's denial of his motions to recuse the OCDA and to dismiss the information for outrageous government conduct.  In order to decide the appeal, the state appellate court considered the same evidence that the trial court had regarding the alteration of the reports.  *Wilkins*, 2020 WL 64715, at *3-8.

Both defendants argue that the Ninth Circuit's decision in *Jackson v. Barnes* here controls.  In that case, the § 1983 plaintiff was convicted at trial using evidence obtained in violation of his *Miranda* rights and the Ninth Circuit vacated the conviction on habeas review; then he was convicted at a second trial where the illegally obtained evidence was not presented.  749 F.3d 755, 758-59 (9th Cir. 2014).  The Ninth Circuit held that *Heck* did not bar the plaintiff's § 1983 claim based on the violation of his Fifth Amendment rights, even though he had a conviction outstanding against him, because the outstanding conviction was entirely "insulated from the inculpatory statements that are the subject of [the plaintiff]'s § 1983 suit against [the defendant]."  *Id.* at 760.  Thus, any judgment in the

---

[2] In *Bradford*, the Ninth Circuit was clear that its holding was based on "traditional rules of accrual" rather than the *Heck* bar.  803 F.3d at 386.  It reasoned, citing *Wallace*, that "*Heck* only applies when there is an extant conviction and is not implicated merely by the pendency of charges."  *Id.*  However, *Bradford* predated the Supreme Court's ruling in *McDonough*, where the Court clarified that *Wallace* "did not displace the principles in *Heck*" and does not implicate a claim that "directly challenges—and thus necessarily threatens to impugn—the prosecution itself."  139 S. Ct. at 2159.  At any rate, *Bradford*'s holding is here relevant as, at the outset of the second prosecution, Wilkins faced the same charges based on the same evidence as the first trial where his conviction was eventually overturned.

11

plaintiff's favor would "not have any bearing" on the validity of his conviction. *Id.* Unlike *Jackson*, the misconduct alleged in the instant case was not and could not be cured by simply excluding certain evidence. The trial court held several hearings during the pretrial litigation to determine how best to remedy the alleged misconduct, and Wilkins maintained that the trial court's solution of recusing two prosecutors and excluding felony murder as a theory was insufficient to guarantee a fair trial. These questions remained before the state courts until the appellate court issued its ruling affirming the trial court's decision.

Thus, the statute of limitations did not begin to run for Wilkins until he had exhausted his state appeals. He properly "defend[ed] himself at trial" and on appeal before bringing his § 1983 claims. *McDonough*, 139 S. Ct. at 2159. Wilkins filed his complaint on December 23, 2020, within a year of the appellate court's decision affirming the trial court, and well within the statute of limitations.

## 2. Tolling

Wilkins argues that he is entitled to both statutory and equitable tolling under California law. In § 1983 cases, federal courts follow state law regarding tolling unless it conflicts with federal law. *See Boston v. Kitsap Cnty.*, 852 F.3d 1182, 1185 (9th Cir. 2017).

California Code of Civil Procedure section 352.1(a) provides in relevant part:

> If a person entitled to bring an action … is, at the time the cause of action accrued, imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term less than for life, the time of that disability is not a part of the time limited for the commencement of the action, not to exceed two years.

Wilkins contends he is entitled to tolling under this statute. (Opp. at 16-18.) Vandiver argues that this section is inapplicable because Wilkins's sentence for his first conviction was twenty-six years to life, and his second sentence (before the appellate court ordered resentencing) was for sixteen years to life, so he was not "imprisoned on a criminal charge

12

… for a term less than for life" within the meaning of the statute.  (Vandiver Reply at 13-14.)  However, California courts have construed this provision to apply only to persons imprisoned for life without the possibility of parole.  *See Brooks v. Mercy Hospital*, 1 Cal. App. 5th 1, 5-7 (2016).  Wilkins is therefore entitled to two years' tolling under section 352.1.  Even if Wilkins's claims began to accrue, as Vandiver would have it, in 2017 after the trial court excluded the felony-murder theory or when the jury rendered its verdict in the second trial, his complaint in this case was timely.  Wilkins was in prison until 2020.  Assuming the statute of limitations began to run at the earlier of Vandiver's two proffered dates, May 17, 2017, it was tolled for two years until May 17, 2019.  At that point, Wilkins had two years to file his claim, so he needed to file his complaint before May 17, 2021.  He filed the complaint on December 23, 2020, which—even adopting Vandiver's theory—was within the statute of limitations.

Because the Court finds that statutory tolling applies, it does not address Wilkins's arguments as to equitable tolling.

### B.  Judicial Notice

A court may take judicial notice of "a fact that is not subject to reasonable dispute" if it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."  *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007).  Thus, the filings, transcripts, and pleadings from Wilkins's state criminal proceedings are all the proper subject of judicial notice and the Court takes notice of all such documents requested by the parties.  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of hearing transcripts, briefs, pleadings, memoranda, and expert reports).  However, the Court will not take judicial notice of facts which are subject to reasonable dispute.  *See Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*,

307 F.3d 1119 (9th Cir. 2002).  Moreover, "where a court takes judicial notice of another court's opinion … it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute." *S.B. ex rel. Kristina B. v. Cal. Dep't of Educ.*, 327 F. Supp. 3d 1218, 1228 (E.D. Cal. 2018).

In addition to transcripts and pleadings from the state criminal proceedings, Wilkins seeks judicial notice of transcripts of audio-recorded interviews conducted by OCDA investigators but provides no basis on which the Court should consider them.  (Wilkins Request for Judicial Notice ("Wilkins RJN"), Doc. 88-24 at 2.)  Accordingly, the Court declines to take judicial notice of these transcripts.

### C. Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  For a right to be "clearly established," it is not necessary that there be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).  The Supreme Court has recognized that the specificity of the right is particularly important in certain contexts, such as in Fourth Amendment cases, where officers must confront situations where it is unclear how the relevant legal doctrines apply.  *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).  However, "general statements of the law are not inherently incapable of giving fair and clear warning" to government officials.  *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotations omitted).  General rules may provide sufficient guidance in "obvious case[s]."  *See Kisela*, 138 S. Ct. at 1153.

Morrison and Vandiver argue that qualified immunity applies to all of Wilkins's claims.  The Court considered and rejected similar arguments in its dismissal order.  (*See* Nov. 4 Order, Doc. 59 at 17-18.)  Here, the Court again finds that Wilkins's rights not to

be subject to criminal charges on the basis of fabricated evidence and not to have exculpatory evidence withheld by officials were clearly established.  Qualified immunity therefore does not apply.

Morrison argues that he is entitled to qualified immunity as to the fabrication of evidence claim because Wilkins's right not to be prosecuted on the basis of fabricated evidence was not clearly established in 2006.  (Morrison Mot. at 26-27.)  According to Morrison, "Wilkins must cite a case clearly establishing that an officer can be held liable for revising traffic collision reports to reflect his inadmissible opinions about the cause of accidents in circumstances where the prosecutor was alerted to those facts, and none of the reports were used by the prosecutor to support the criminal charges against the criminal defendant."  (*Id.* at 27.)  Wilkins contends that the right is clearly established.

In *Devereaux v. Abbey*, the Ninth Circuit found that the "virtually self-evident" proposition that there is a "constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government" was clearly established.  263 F.3d 1070, 1075 (9th Cir. 2001).  The Court finds that it was clearly established in 2006 that the conduct Wilkins alleges was unconstitutional.  It is not necessary, as Morrison suggests, that there be a case establishing that it is unconstitutional to fabricate every particular type of evidence.  The exculpatory evidence that Morrison destroyed and the inculpatory evidence he created was going to the prosecutor to be used to make charging decisions; this is the obvious case that every reasonable officer would understand falls directly under *Devereaux*.  Because the Court finds that the right not to be charged on the basis of fabricated evidence was clearly established, Wilkins and Vandiver are also not entitled to qualified immunity on the claim of conspiracy to violate civil rights. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) (noting that a claim of conspiracy "does not enlarge the nature of the claims").

Similarly, Wilkins had a clearly established due process right not to have material exculpatory evidence suppressed from his defense.  *See Brady v. Maryland*, 373 U.S. 83,

87 (1963); *Carillo v. Cnty. of L.A.*, 798 F.3d 1210, 1219 (9th Cir. 2015) (finding, for purposes of qualified immunity analysis, that it was clearly established law in 1984 that police officers have a duty to disclose material exculpatory evidence); *see also Mellen v. Winn*, 900 F.3d 1085, 1103 (9th Cir. 2018) (stating it "is not an open question in our Circuit" whether police officers had a duty to disclose material impeachment evidence to prosecutors by 1997). It was clearly established by 2006 that both Morrison and Vandiver suppressing material exculpatory evidence was a violation of a defendant's due process rights. As above, the claims for conspiracy to violate Wilkins's *Brady* rights are not subject to qualified immunity.

### D. The Claims

Wilkins, Morrison, and Vandiver characterize the evidence in the record in vastly different ways. At summary judgment, it is not the Court's role to make factual determinations, and supportable inferences must be drawn in Wilkins's favor. Here, there are a number of genuine disputes of material fact which preclude summary judgment on Wilkins's claims.

### 1. Fabrication of Evidence

"To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). Morrison argues that Wilkins has failed to demonstrate both elements.[3] He argues that there is insufficient evidence of deliberate fabrication because he changed only the opinions as to the PCF of the collisions, and not the factual evidence gathered by the officers; traffic collision reports are not evidence admissible in court and officers may not testify as to their opinions regarding the cause of an accident under California law; and to

---

[3] Vandiver also argues that summary judgment should be granted as to the fabrication of evidence claim against him. (Vandiver Mot. at 23-24.) However, the Court dismissed this claim against him with prejudice after Vandiver filed his summary judgment motion and therefore need not consider these arguments. (*See* July 20 Order, Doc. 84 at 7.)

the extent that Wilkins's claim rests on Morrison's nondisclosure of the other officers'
conclusions, that is not an appropriate basis for a fabrication of evidence claim.  (Morrison
Mot. at 21-22.)  Wilkins argues that Morrison "manufactured evidence to obtain a murder
conviction against Wilkins" in changing the PCF in the non-fatal collision reports and
directing Bernardin to change the PCF in the fatal collision report to "other than driver."
(Opp. at 18-19.)

As a preliminary matter, the admissibility of traffic reports and whether police
officers may testify regarding their opinions of the causes of collisions are immaterial to
the fabrication of evidence claim.   Morrison understood that the reports that he altered
would be turned over to the District Attorney's office, who would ultimately determine
whether to bring any charges against Wilkins.  (Morrison Deposition, Doc. 88-4, 12:12-16;
13:12-15.)  It is not the ultimate admissibility of a document that makes it evidence.  *See
United States v. Bundy*, 968 F.3d 1019, 1040 n.8 (noting that "*Brady* evidence does not
necessarily have to be admissible").  The implication of Morrison's argument is that police
officers' opinions as to the admissibility of various forms of evidence at a potential future
trial is relevant to the inquiry into whether fabricating such evidence violates a defendant's
constitutional rights, a plainly preposterous contention.

Given the evidence in the record, and drawing all inferences in Wilkins's favor as
we must on summary judgment, genuine disputes of material fact exist as to the events that
would permit a jury to find that Morrison fabricated evidence.  Morrison testified in his
deposition that he took the collision report prepared by Officer Heckenkemper, "copied it
verbatim mostly" into a new report, and changed the PCF to "other than driver" and
changed the related factors without discussing the change with Officer Heckenkemper,
who was on vacation at the time.  (Morrison Deposition at 4:14-5:10; 6:18-21; 7:8-12;
23:25-24:3.)  He testified that after he rewrote the report, he destroyed Officer
Heckenkemper's report.  (*Id.* at 7:18-19.)  He further testified that he told Officer
Bernardin to change the PCF in the fatal collision report to "other than driver."  (*Id.* at

9:11-22.)  Morrison knew that Wilkins had been arrested when he rewrote Officer Heckenkemper's report, and knew that the reports would be turned over to the District Attorney's office.  (*Id.* at 11:16-12:16.)  He answered in the affirmative when asked if he told Officer Bernardin to change the PCF "so that all the primary collision factors were the same" in the various collision reports.  (*Id.* at 14:8-10.)

The parties dispute the propriety of Morrison changing the reports and directing Officer Bernardin to change the PCF as to the fatal accident.  Morrison has put forth a declaration from retired CHP officer Scott Taylor where he states that destroying the initial reports was the appropriate procedure.  (*See* Taylor Decl., Doc. 77-4 at ¶ 10.)  Wilkins has put forward a declaration from Roger Clark, an expert in police procedures and tactics, where Clark opines that the proper procedure would have been for Morrison to attach supplemental reports to Officers Heckenkemper and Bernardin's reports rather than changing the report himself and telling Officer Bernardin to put in a different PCF.  (Clark Decl., Doc. 88-1 at ¶¶ 14-17.)  Morrison himself testified in his deposition that there was a system in place for changing reports with what was known as a "buck slip" where a sergeant or reviewing officer would note problems or things that needed to be corrected in reports on a separate sheet, but that he did not use a buck slip in altering the reports. (Morrison Deposition at 30:12-22.)  Wilkins also argues that Morrison was a K-9 officer and would therefore not typically override the opinions of officers who were experienced in collision investigation like Officers Bernardin and Heckenkemper.  (Morrison Reply to Wilkins SGD ("Morrison SGD Reply"), Doc. 90 at ¶ 13; Heckenkemper Aug. 24 Testimony, Doc. 88-17 at 12:11-13:16.)

The parties also dispute whether the initial reports were finalized when Morrison destroyed and rewrote them.  Morrison argues that he "rewrote draft reports."  (Morrison Mot. at 12.)  Wilkins argues that Officer Heckenkemper had completed his report before he left for vacation and that it was signed off on by the Accident Investigation Unit.  (Pl's SGD Morrison ¶ 19; *see* Heckenkemper Apr. 26 Testimony at 8:7-9:24.)  He also argues

that Officer Bernardin had already completed and submitted his report before Morrison instructed him to change the PCF.  (*Id.* at ¶ 31; *see* Bernardin Interview, Doc. 88-8 at 5.)

In light of this and other evidence in the record, a jury could reasonably conclude that Morrison deliberately changed the PCF factors in the non-fatal report and told Officer Bernardin to change the PCF in his report so that all of the reports would align with the theory that the stove in the roadway – rather than the individual drivers' unsafe speeds or unsafe driving – caused the collisions.  This evidence would help sustain a felony-murder theory while contradictory evidence that the stove was not the primary cause of the collisions would not.  That Morrison destroyed the reports rather than supplementing them, which Wilkins has adduced evidence to show was not proper procedure, provides further reason to infer that Morrison acted in order to prevent defense counsel from finding out that at least two officers were of the opinion that the collisions were due to the drivers, rather than the stove that fell from Wilkins's truck.  So too does the evidence that Morrison would not typically investigate traffic collisions and that Officers Heckenkemper and Bernardin had already submitted the reports before Morrison altered them.

Morrison argues that he is entitled to summary judgment on the second element, causation, because the prosecutor was told during the first trial about the changed collision reports, so the prosecutor's independent judgment to continue prosecuting Wilkins for felony murder was an intervening event breaking the chain of causation.  (Morrison Mot. at 23-24.)  Wilkins points out that the prosecution was not alerted to the changed collision reports until the trial was underway, years after the charging decision was made and at a point at which the prosecution had been relying on the reports for years. (Opp. at 19.)

"Deliberately fabricated evidence in a prosecutor's file can rebut any presumption of prosecutorial independence."  *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1116 (9th Cir. 2018).  The presumption of prosecutorial independence is overcome "if a plaintiff establishes that officers either presented false evidence to or withheld crucial information from the prosecutor."  *Id.*  In *Caldwell*, the Ninth Circuit found that where the

evidentiary record used to make charging decisions contained allegedly fabricated information, the presumption of prosecutorial independence was rebutted, even where the prosecutor apparently considered the potential of the evidence's falsity after charging decisions were made.  *See id.* at 1117-18.  Here, there is ample evidence in the record that would allow a jury to find that the prosecutor relied on the altered police reports in making charging determinations without knowledge of the fact that they had been altered. Summary judgment on the fabrication of evidence claim is therefore denied.

### 2. *Brady* Violation

"[T] he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  "Since the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, [are] guilty of nondisclosure." *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978); *see also Carrillo*, 798 F.3d at 1220 ("[P]olice officers and prosecutors alike share an obligation to disclose pertinent material evidence favorable to the defense") (quotations omitted).  "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Barker v. Fleming*, 423 F.3d 1085, 1096 (9th Cir. 2005) (quotations omitted).  The materiality inquiry is not merely a determination of whether there was sufficient evidence without the undisclosed inculpatory evidence to support the conviction; "[r]ather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Strickler v. Greene*, 527 U.S. 263, 290 (1999) (quotations omitted).  "[A] § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors."  *Tennison v. City & Cnty. of S.F.*, 570 F.3d 1078, 1088 (9th Cir. 2009).

Morrison argues that Wilkins's *Brady* claim must fail because (1) the collision reports were not material, since they were not presented at the first trial and because a jury who heard about the alteration of the reports nevertheless convicted Wilkins of second-degree murder at the second trial; and (2) the prosecutors were eventually presented with evidence regarding the altered reports and decided to pursue the felony murder theory regardless so Morrison's failure to disclose did not cause the *Brady* violation.  (Morrison Mot. at 29-30.)  Vandiver argues that he is entitled to summary judgment as to the *Brady* claim because he allegedly learned about the alterations in April 2008, and there was no prejudice from any nondisclosure since the information was presented to the prosecutor. (Vandiver Mot. at 28.)

There is ample record evidence to support the conclusion that the information regarding the alteration of the reports was material.  Even if the altered reports were not presented to the jury at the first trial, the fact that the jury was not told that collision reports turned over to the prosecution were altered (and the initial reports destroyed) in such a way as to give the impression that there was consensus by investigating officers that the stove, rather than the individual drivers, was the cause of the collision is the kind of information that "put[s] the whole case in such a different light as to undermine confidence in the verdict."  *Strickler*, 527 U.S. at 290.  The second trial is not really a counterfactual for the first, as Morrison argues, since the prosecution could not – because of the *Brady* violations – pursue a felony murder theory, and Wilkins was convicted of second-degree rather than first-degree murder.  That Morrison is alleged to have known about and destroyed exculpatory evidence and then fabricated inculpatory evidence supports an inference that he acted with deliberate indifference to Wilkins's due process rights.  As to Vandiver, Wilkins alleges that Vandiver made a statement to the effect that he did not want to know about altered reports and officers' differing opinions as to the causes of the collisions. This too would permit a jury to conclude that he acted with deliberate indifference to Wilkins's rights in not disclosing this information.

The Court has already rejected Morrison's causation argument regarding the fabrication of evidence claim, and it fares no better here.  A *Brady* "violation may be cured … by belated disclosure of evidence, so long as the disclosure occurs 'at a time when disclosure would be of value to the accused.'"  *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) (quoting *United States v. Span*, 970 F.2d 573, 583 (9th Cir. 1992)).  The pertinent question is whether the delay prejudiced the defendant.  *See Tennison*, 570 F.3d at 1093.  It is not clear at what point during the first trial Chief Beeuwsaert's disclosure regarding the alteration of the reports occurred, but it was long after Wilkins had been charged and had to craft a defense.  A jury could find that this delay prejudiced Wilkins.  Similarly, a jury could find that Vandiver's failure to come forward with the information when he received it prejudiced Wilkins.

### 3.  Conspiracy Claims

"A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage."  *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (quoting *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330, 1343 (9th Cir. 1990) *as amended on denial of reh'g* (July 15, 1999).  To show a conspiracy, "the plaintiff must show that the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement."  *Id.* (quotations and citations omitted).  It is not necessary for a plaintiff to put forward direct evidence to meet this burden; "[a] defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions."  *Id.* at 856-57.

Wilkins argues that there is sufficient evidence in the record to show an agreement between Morrison and Vandiver to deprive Wilkins of his constitutional rights.  (Opp. at 24.)  He argues that Vandiver and Morrison had a common objective to obtain a murder conviction against Wilkins.  (*Id.*)  In furtherance of the conspiracy, he argues: (1) Morrison

destroyed reports; (2) Morrison changed or directed others to change the PCF to "other than driver" in reports regarding the non-fatal and fatal collisions; (3) Morrison met with the OCDA investigator; (4) Vandiver testified for the prosecution regarding the cause of the fatal collision; and (5) Morrison and Vandiver suppressed evidence. (*Id.*) Wilkins further contends that an email from a district attorney to Morrison where the district attorney thanks Morrison for "an incredible job on [the] investigation" and states that Wilkins "needed to go" provides circumstantial evidence of an agreement between Morrison and the OCDA office, which included Vandiver, to conspire to obtain a murder conviction. (*Id.* at 25.)

There is sufficient evidence here in the record for a reasonable jury to infer the existence of a conspiracy involving Morrison and Vandiver to deprive Wilkins of his civil rights and to commit a *Brady* violation. As to Morrison, there is ample evidence that would allow a jury to conclude that he acted with a purpose of causing Wilkins to be charged on the basis of fabricated evidence and to suppress exculpatory evidence from Wilkins's defense. His communications with the OCDA would permit the inference that this was done in concert with OCDA members, including Vandiver. As to Vandiver, Plaintiff has set forth evidence that Vandiver relied on Officer Bernardin's fatal collision report, that Officer Heckenkemper told him about the alteration and destruction of reports and that Officer Bernardin disagreed that the stove was the cause of the fatal collision, that Vandiver's response was to say that he did not want to hear about it, that Vandiver did not tell the prosecution about the altered evidence, and that Vandiver opined at the first trial that the stove was the primary cause of the fatal collision. Taken together, these actions would permit a jury to infer that Vandiver acted with the objective of subjecting Wilkins to criminal charges on the basis of fabricated evidence and suppressing exculpatory evidence. This evidence would further allow a jury to infer that Vandiver acted in concert with others to achieve these objectives.

### 4.  Punitive Damages

Vandiver argues that Wilkins's claim for punitive damages must fail because the undisputed evidence does not here show that he acted with evil motive or intent, or with reckless or callous indifference to a federally protected right.  (Vandiver Mot. at 30); *see Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) ("[W]e have recognized that it is well-established that a jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others.") (cleaned up).  However, from the evidence Wilkins set forth that Vandiver disclaimed wanting to know about the investigating officers' differences of opinion from the collision reports given to the prosecution, a jury could conclude that Vandiver intended to deprive Wilkins of his due process rights, or at least that he was callously indifferent to such a deprivation.

### IV.    CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment are DENIED.


DATED:  October 25, 2022

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE